**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**
**TULSA DIVISION**

| | |
|---|---|
| 1. ALERT 360 OPCO, INC. d/b/a ALERT 360    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | |
| ) | Case No.:  24-cv-00316-MTS |
| 1. LA ALARMS LLC and    ) | |
| 2. GARY HAND,    ) | |
| ) | |
| Defendants. | |

## COMPLAINT

Plaintiff Alert 360 Opco, Inc., d/b/a Alert 360 ("Alert 360"), brings this action for damages, punitive damages, attorneys' fees, and costs against Defendants LA Alarms LLC and Gary Hand ("Defendants") and in support, allege as follows:

## SUMMARY OF THE CASE

1.     This case is about Defendants' false and misleading sales practices on the doorsteps, in the homes of, and through predatory telemarking solicitations, of numerous Alert 360 customers.

2.     Through well-rehearsed sales tactics, Defendants have misled scores of Alert 360 customers into believing, among other things: (1) that Alert 360 has gone out of business; (2) that Alert 360 is in bankruptcy; (3) that LA Alarms is the manufacturer of Alert 360's equipment; (4) that Alert 360 changed its named to LA Alarms; (5) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (6) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.  These affiliation

misrepresentations allow Defendants to freeride on the goodwill of Alert 360, damage Alert 360's name, and lead Alert 360's customers to do business with LA Alarms under false pretenses, typically resulting in the Alert 360 customer becoming bound into a multi-year contract with LA Alarms, valued in the thousands of dollars, that is impossible for the customer to extricate himself or herself from once the customer has finally become aware of Defendants' deception.  These practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and constitute common law trademark infringement, common law unfair competition, tortious interference with a contract, and a violation of the Oklahoma Deceptive Trade Practices Act. In the alternative, at a bare minimum, they constitute negligent supervision and training of sales representatives and sales managers on the part of Defendants.  Moreover, these practices constitute a breach of the Dealer Agreement between the Parties.

3.      Alert 360 seeks damages to remedy its loss of numerous customers (some known, some unknown) and the disruption of thousands of others since 2020; Alert 360's injuries to its goodwill and reputation, including the significant money and resources Alert 360 expends to remedy or counter Defendants' deceptive conduct; Alert 360's lost royalties from Defendants' unauthorized use of the Alert 360 brand; Defendants' profits from their ill-gotten gains; Alert 360's attorneys' fees; and punitive damages to punish and deter Defendants from continuing to engage in its intentional conduct.

## PARTIES

4.      Plaintiff Alert 360 Opco, Inc. is a Delaware corporation with its principal place of business at 2448 E. 81st Street, Suite 4300, Tulsa, Oklahoma 74137.

5.      Alert 360 is a leader in customized security and home automation solutions for more than 50 years. It is the fifth largest provider of monitored security and smart home solutions to homes in the United States, and provides services to customers in Oklahoma and 19 other states.

6.      Defendant LA Alarms is a Louisiana limited liability company with its principal place of business at 940 O'Neal Lane, Baton Rouge, Louisiana.  Its registered agent for service of process is Kristine D. Smiley, Tierney and Smiley, LLC, 3535 S. Sherwood Forest Blvd., Suite 233, Baton Rouge, LA 70816.

7.      LA Alarms is a competitor of Alert 360 in the home security alarm monitoring market.

8.      Defendant Gary Hand is an employee of LA Alarms.  Upon information and belief he is the Vice President of Sales of LA Alarms.  Upon information and belief, his address is 34339 Quarter Horse Ln, Walker, Louisiana 70785.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under Section 43 of the Lanham Act.

10.      This Court has supplemental jurisdiction over the state law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

11.      This Court also has subject matter jurisdiction over this action pursuant to Section 1332 of Title 28 because the parties are completely diverse, and the amount in controversy exceeds $75,000.

12.      Venue lies in this District pursuant to Section 1391(b) of Title 28 because the Parties agreed to a forum selection clause in the Agreement to Purchase and Sell Assets (the "Dealer Agreement") between Alert 360 and LA Alarms, attached hereto as Exhibit 1, which sets

this Court as one of two permissible venues for disputes between the Parties.  *See* Ex. 1 at Section 33.11.

13.     This Court has personal jurisdiction over LA Alarms because it agreed to irrevocably submit to the jurisdiction of this Court in the Dealer Agreement.  *See id*.

14.     Moreover, this Court has personal jurisdiction over both Defendants because Defendants committed tortious conduct purposefully directed at a citizen of this District as described herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### ALERT 360 AND LA ALARMS COMPETE IN THE HOME SECURITY SYSTEM, AUTOMATION, AND SMART HOME MARKETS

15.     Alert 360 was founded in 1973 and is the 5th largest security company for residential customers in the United States.

16.     Alert 360 provides security, automation, and smart-home services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

17.     Alert 360's name and trademarks are registered with the United States Patent and Trademark Office.

18.     Plaintiff Alert 360 Opco, Inc. owns the Alert 360 name and trademarks registered in the United States Patent & Trademark Office that bear the registration numbers 87925660 and 623803 and applications that bear the application numbers 90/361744 and 87/925660.

19.     LA Alarms and Alert 360 are now direct competitors in the security systems, automation and smart home markets, after having a dealer relationship for several years. Alert 360 and LA Alarms market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers.  The companies also

provide substantially similar security monitoring services to their respective customers.  Alert 360 operates in both of the states in which LA Alarms sells and installs alarm systems.

**THE DEALER AGREEMENT BETWEEN LA ALARMS AND ALERT 360**

20.     LA Alarms was once an authorized dealer of Alert 360 home security systems pursuant to the terms of a Dealer Agreement between the Parties.  *See* Exhibit 1.

21.     Under that Dealer Agreement, LA Alarms sold home security systems door to door on Alert 360's behalf.  LA Alarms simultaneously sold security alarms systems under its own name but was subject to a three year non-compete agreement for those customers to which it sold on Alert 360's behalf.  In short, LA Alarms could not sell an Alert 360 home security system to a customer as a dealer of Alert 360 and then turn around and try to recruit that customer to be an LA Alarms customer.

22.     What Defendants have done instead is lie in wait until the non-compete clause on those Alert 360 customers has expired, and then they immediately target those Alert 360 customers, whose homes they had been to before as an authorized dealer of Alert 360, with deceptive sales practices.  Specifically, make one or more of the following misrepresentations about Alert 360: (1) that Alert 360 has gone out of business; (2) that Alert 360 is in bankruptcy; (3) that LA Alarms is the manufacturer of Alert 360's equipment; (4) that Alert 360 changed its named to LA Alarms; (5) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (6) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

23.     Defendants leveraged their prior relationship through the Dealer Agreement— including the knowledge of specific, proprietary Alert360 customer information and the trust built

upon Alert360's existing relationship with the customers—to make its false, misleading, and negligent sales pitches more believable to Alert360 customers.

24.    In addition to targeting customers previously off limits under the non-compete with deceptive sales practices, Defendants also target Alert 360 customers they discovers through other means like Alert 360 yard signs in the customer's yard.

### DEFENDANTS' DECEPTIVE SALES PRACTICES

25.    Despite knowing that these statements are false, Defendants and their sales representatives use these pitches to gain entry into the customers' homes.  Once inside, having won the customers' trust by this deception, the representatives have customers sign LA Alarms contracts and install LA Alarms alarm systems in the often mistaken belief that they are receiving new Alert 360 equipment from Alert 360, an Alert 360 affiliate, or an Alert 360 successor, that LA Alarms is assuming the customer's Alert 360 account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.

26.    Additionally, Defendants have employed the same deceptive practices through false, misleading, or negligent telemarking pitches during which an employee generates sales or sales leads through the same inaccurate sales pitch to convert customers.

27.    In reality, neither Defendants nor their sales representatives are affiliated with Alert 360 in any way because Defendants are not selling to any of these customers as an authorized dealer of Alert 360, pursuant to the Dealer Agreement or otherwise.

28.    Moreover, Defendants have not legitimately assumed any Alert 360 customer accounts or succeeded Alert 360 in the home security monitoring market.  Accordingly, the statements made by Defendants' respective sales representatives in order to gain entry into the

6

homes of Alert 360's customers and convince them to allow the sales representative to replace Alert 360 equipment and/or the underlying alarm monitoring services are false and misleading.

29.     Having heard Defendants' untrue claims of affiliation with Alert 360, Alert 360's customers allow Defendants' sales representatives into their homes in the mistaken belief that they are speaking with a person somehow affiliated with Alert 360, visiting to provide the customers with goods and services that are related to their existing Alert 360 alarm system.  Alert 360's customers repeatedly confirm that but for this initial confusion, they would never have allowed Defendants' sales representatives into their homes or to otherwise inspect, manipulate, or replace the equipment previously installed by Alert 360.

30.     The alarm monitoring services provided by Alert 360, and subscribed to by Alert 360's customers, require the use of equipment compatible with Alert 360's services.  Accordingly, once Defendants remove Alert 360's equipment from customer homes and replace it with LA Alarms equipment, Alert 360 is typically no longer able to provide the services for which its customers have contracted.

31.     As a result, a number of Alert 360 customers have unwittingly found themselves with LA Alarms' alarm systems installed in their homes, and with simultaneous contractual obligations to both Alert 360 and LA Alarms, who deceived them into entering into a contract under false pretenses.

32.     In other instances, the customers retained LA Alarms' systems and terminated their Alert 360 contracts because Defendants make it too difficult and time-consuming for the customer to end LA Alarms' service, even through the contracts were entered into because of Defendants' deceptive practices.  In some circumstances, Defendants will require their dishonestly obtained

customers to pay substantial contract-termination fees without consideration that the customer's contract was acquired through false and deceptive means.

COMPLAINTS BY ALERT 360 CUSTOMERS

33.     Alert 360 has received, and continues to receive, reports of deceptive sales encounters by Defendants' sales representatives from Alert 360 customers.  As explained in the next section, these complaints represent a small fraction of Defendants' actual malfeasance against Alert 360 customers.  Upon information and belief, internal LA Alarms documents will reveal the true scale of Defendants' wrongdoing against Alert 360 customers.

34.     To date, Alert 360 has received numerous complaints from its customers about Defendants' deceptive sales practices. Alert 360 anticipates by the time of trial, the volume of Alert 360 consumers complaining about Defendants' deceptive sales practices will be even greater.

35.     Defendants' deceptive sales practices and claims of affiliation with Alert 360 are commonplace in their interactions with Alert 360 customers.  And as a result, Alert 360 is left to spend its own capital correcting and otherwise repairing the damage done by Defendants' conduct.

36.     The complaints Alert 360 receives from its customers are disturbing.  In addition to nearly every interaction between Defendants and Alert 360 customers involving deception, Defendants' sales tactics are often accompanied by other reprehensible conduct, like Defendants targeting the elderly, employing aggressive methods to enter the customer's home without permission, and even hurling insults and degrading comments to individuals that refuse their sales pitch.

*Complaints from Alert 360 Customers about Defendants' Deceptive Conduct*

37.     Alert 360's customer support teams have been plagued with complaints about the deceptive conduct of Defendants towards Alert 360's customers.

8

38.     Alert 360 Customer A. Ross was targeted by LA Alarms sales representative "Nick," who came to her doorstep in October 2020 and told her that LA Alarms had merged with Alert 360 and began installing LA Alarms equipment.  Because LA Alarms had deceived Ms. Ross into believing LA Alarms and Alert 360 were one in the same, she did not realize she had been duped until it was too late.

39.     Alert 360 Customer K. Diab was targeted by LA Alarms sales representative Justin Monks, who came to his doorstep in October 2021 and told him that Alert 360 had been sold to LA Alarms.

40.     Alert 360 Customer J. Broxton was targeted by LA Alarms sales representatives who came to his doorstep in November 2023 and told him that LA Alarms was there to upgrade his existing Alert 360 alarm equipment.

41.     Alert 360 Customer S. Morton was targeted by LA Alarms sales representatives via telephone in November 2023, who told her LA Alarms was partnered with Alert 360 and that she was due for an upgrade.

42.     Alert 360 Customer L. Phillips was targeted by an LA Alarms sales representative who came to her doorstep in November 2023 and told her that Alert 360 was going out of business, and LA Alarms had come to replace her equipment and take over her service.

43.     Alert 360 Customer M. Jones was targeted by LA Alarms sales representative Christopher Murphy and further victimized by Gary Hand.  Mr. Murphy told Ms. Jones that LA Alarms needed to upgrade her alarm system.  He was able to provide her with her personal information, which led her to believe LA Alarms was connected to Alert 360.  Mr. Murphy told her that there would be an upcharge of $62 on her January 2024 Alert 360 bill if she did not upgrade her equipment.  As a result, Ms. Jones unwittingly entered into a contract with LA Alarms.  Once

she realized she had been duped, she went to meet with Gary Hand at LA Alarms' offices to try to get out of the contract since attempts to contact him via telephone to cancel her contract proved futile.  Although Mr. Hand provided no assistance with canceling her contract, he did make a number of admissions about his own and LA Alarms' misconduct.  Mr. Hand told Ms. Jones that he worked with Alert 360 years ago and decided to leave to start his own business with LA Alarms. He further explained that LA Alarms watches and contacts Alert 360 customers "through their system," in the same misleading manner Ms. Jones was contacted, to get them to switch to LA Alarms.  He then proceeded to ignore all communications from her regarding the contract with LA Alarms she had been deceived into signing.

44.     Alert 360 Customer T. Freeman was targeted by an LA Alarms sales representative via phone solicitation and again at her doorstep in January 2024 and told her that LA Alarms had partnered with Alert 360 and that her system needed upgrading.

45.     Alert 360 Customer A. Brumfield was targeted by an LA Alarms sales representative who identified himself as "Chris" but provided a business card for Gary Hand.  This sales representative came to her doorstep in February 2024 and told her that Alert 360 was going out of business and that LA Alarms had come to replace her equipment and take over her service.

46.     Alert 360 Customer R. Celestine was targeted by an LA Alarms sales representative who came to her doorstep in February 2024 and told her that LA Alarms had partnered with Alert 360 and that he needed to collect information of her alarm system and her personal information.

47.     Alert 360 Customer M. Glenny was targeted by an LA Alarms sales representative who came to her doorstep in February 2024, and deceived her into switching her equipment over to LA Alarms' equipment.  Days later when she realized she had been deceived, she attempted to

call LA Alarms to cancel the service.  She could not get anyone from LA Alarms to return her phone calls, despite repeated attempts to contact LA Alarms.

48.     The Alert 360 customer complaints cited above are but a small sample of a much larger population of the pervasive misconduct by LA Alarms' sales representatives, which have continued unabated.  The population of reported instances is, in turn, but a small fraction of the likely number of occurrences in the market.  It is an accepted and obvious tenet of consumer complaint behavior that for every aggrieved customer who reports a deceptive sales practice, many more go uncounted.

### THE REPORTED NUMBER OF DEFENDANTS' DECEPTIVE SALES PRACTICES IS THE TIP OF THE ICEBERG

49.     Upon information and belief, LA Alarms' own internal records will show how widespread and pervasive its deceptive sales practices are.  Many Alert 360 customers subjected to Defendants' deceptive sales practices will never complain to Alert 360.  Rather, upon learning of the deceptive conduct Defendants subjected them to, they will complain to LA Alarms.  Alert 360 would therefore not have records of such conduct.  Nevertheless, on information and belief, LA Alarms will have exclusive possession and control of such records demonstrating their respective deceptive sales tactics.

50.     As the example complaints illustrate, Defendants have tailored their sales pitches to confuse Alert 360's customers on their doorsteps.  Defendants make false representations of affiliation with Alert 360 to win the customers' interest and trust.

51.     Alert 360 customers allow Defendants and their representatives into their homes in the mistaken belief that they are speaking with a person affiliated somehow with Alert 360, visiting to provide the customers with goods and services that are related to their existing Alert 360 alarm system.  Alert 360's customers repeatedly confirm that but for this initial confusion, they would

11

never have allowed Defendants and their representatives into their homes.

52.     This confusion at the outset of a sale harms Alert 360 by allowing competitors like LA Alarms to freeride on Alert 360's goodwill to gain its customers' attention and trust.  Any efforts by Defendants to later clarify their lack of Alert 360 affiliation do not cure the confusion that has already occurred at the outset of the transaction, even in those instances where a customer understands by the point of sale that he or she is contracting with LA Alarms.  But in most instances, the customer signs a contract with LA Alarms in the mistaken belief that he or she is signing only a work authorization for the installation of Alert 360 equipment by Alert 360 or its affiliate.

### DEFENDANTS' CONDUCT IS KNOWING AND INTENTIONAL

53.     Defendants' conduct is knowing and intentional.  At best, LA Alarms is aware of such conduct by Gary Hand and its sales representatives but does not take sufficient actions to adequately train and supervise its sales managers and sales representatives to prevent this conduct from happening.  At worst, LA Alarms knowingly teaches and condones these actions by Gary Hand and its sales representatives.

54.     LA Alarms is aware of the unlawful, deceitful, and deceptive practices and conduct of Gary Hand and its sales representatives.

55.     Defendants' unlawful conduct at the expense of Alert 360 has not stopped, and will not stop, because LA Alarms generates significant profits from its deceptive sales practices.  Upon information and belief, LA Alarms realizes profits in at least the hundreds of thousands dollars based on the deceptive sales tactics of its sales force.  Every alarm account LA Alarms acquires through deceptive sales practices creates a new revenue stream for LA Alarms, potentially for several years beyond the initial term of the new contract and for substantially more value than the

cost to LA Alarms in the cases where it "buys out" the customer's Alert 360 account. Thus, Defendants' deceptive sales practices are designed to obtain as many accounts as possible through whatever means possible. Upon information and belief, such conduct has permitted LA Alarms to bolster its financial reports and receive new credit and/or equity investments that otherwise might not be possible without the illegal sales conduct. Such profits should be disgorged to the full extent permitted by the Lanham Act and related common law.

**IN THE ALTERNATIVE, LA ALARMS' CONDUCT IS NEGLIGENT AND/OR GROSSLY NEGLIGENT**

56. In the alternative, LA Alarms is negligent and grossly negligent in the training and supervision of its sales managers and sales representatives, including but not limited to Gary Hand.

57. LA Alarms has been put on notice that its sales managers and sales associates, including but not limited to Gary Hand, are engaging in deceptive sales practices from customer complaints directly to LA Alarms as well as through complaints to the Better Business Bureau regarding deceptive sales practices by LA Alarms' sales representatives.

58. Although these deceptive sales practices are unacceptable in the alarm services industry, and LA Alarms has notice that its sales managers and sales associates, including but not limited to Gary Hand, still engage in such practices, LA Alarms has failed to adequately train its sales managers and sales associates on what appropriate, honest sales tactics are permissible in the industry.

59. LA Alarms has also failed to adequately supervise its sales managers and associates, including but not limited to Gary Hand. to prevent these deceptive sales practices from happening.

**ALERT 360 HAS INCURRED SIGNIFICANT DAMAGES RESULTING FROM
DEFENDANTS' CONDUCT**

*Costs Incurred Repairing and/or Mitigating the Effects of Defendants' Deception*

60.     Defendants' deceptive sales tactics irreparably injure Alert 360's relationships with its existing customers.  As a result of Defendants' manipulation, Alert 360's customers allow LA Alarms' sales representatives entry to their homes under false pretenses, sign LA Alarms' contracts, uninstall their Alert 360 alarm systems, replace these systems with LA Alarms' own equipment, and terminate their Alert 360 contracts.

61.     Even where Alert 360's customers subsequently recognize the scam perpetrated by Defendants, Alert 360 has no option but to send technicians to the deceived customers' houses to reinstall, or even replace, the removed Alert 360 equipment at considerable expense to Alert 360. Defendants are liable to Alert 360 for these costs, property damages, and other financial and reputational harms caused by Defendants' conduct.

62.     The constant need to proactively notify Alert 360 customers of Defendants' conduct—especially at the beginning of the summer sales season—as well as assist Alert 360 customers in fixing problems resulting from Defendants' deceptive sales conduct, imposes a substantial cost on Alert 360.  Because of Defendants' persistent deceptive sales practices, Alert 360 has to send out affirmative notifications to customers, hire, maintain, and train customer service agents, and otherwise allocate money, employees, and resources away from normal business operations to constantly police Defendants.  Defendants are also liable for these costs, property damages and other economic harms.

### *Injury to Alert 360's Goodwill and Reputation*

63.     Defendants' deceptive sales tactics also injure Alert 360's goodwill and reputation. Depending on which false story Defendants communicated to any given customer, Alert 360's customers are left with the false belief that Alert 360 is out of business, that Alert 360 is in bankruptcy, that Alert 360 has been acquired, that their Alert 360 alarm systems are outdated and

vulnerable to burglars, or that LA Alarms has taken over Alert 360 accounts.  Others mistakenly believe that Defendants inappropriately gained access to the private data the customers had entrusted to Alert 360 (and in some instances convince customers to provide passwords and other alarm system credentials), leaving them to question Alert 360's ability to safeguard their interests, a critical shortcoming given the necessity of trust between any alarm services provider and its customers.

64.     In a broader sense, Defendants' actions damage Alert 360's goodwill and reputation as a reliable provider of security, automation, and smart home services.  Defendants' targeting of Alert 360 customers has led some to cease all services with Alert 360 as a result of falling victim to these types of false and misleading practices.  Some wrongly blame Alert 360 for Defendants' conduct and never come to understand the lack of affiliation between LA Alarms and Alert 360.

65.     Even where Alert 360 customers understand Defendants'scams for what they are, Alert 360's goodwill and reputation is harmed, as some customers may reconsider their Alert 360 service because Alert 360 is a target of scammers.

66.     Customers often blame themselves for falling victim to Defendants'false and misleading sales tactics.  Such self-blame not only contributes to an under-reporting of deceptive sales conduct, but irreparably harms Alert 360's goodwill and reputation because customers believe they never would have fallen victim if they did not have an Alert 360 system in their home in the first place.

*Misappropriation of Alert 360's Authorized Dealer Licensing*

67.     By falsely claiming an affiliation with Alert 360 in its sales to consumers, LA Alarms further injures Alert 360 by taking for itself the essential benefit of being an Alert 360 affiliate without paying any royalty or other consideration to Alert 360 for the claim of affiliation.

This is a benefit for which hundreds of licensed Alert 360 dealers pay substantial financial consideration to Alert 360.

68.     Indeed, LA Alarms is intimately familiar with this dealer arrangement as it has had a Dealer Agreement with Alert 360 in the past.  But LA Alarms has found it more profitable to instead pays nothing to use Alert 360's name and brand for its own benefit, rather than paying substantial sums for the rights provided through an official licensing relationship with Alert 360. Moreover, LA Alarms does not abide by Alert 360's dealer guidelines and so misappropriates a right of affiliation with Alert 360.

*Defendants' Deceptive Conduct Is Knowing and Intentional*

69.     Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce.  They also violate the security system industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, inter alia, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

70.     Defendants know these types of sales practices are contrary to the law and established industry standards, yet they knowingly continue such conduct.  LA Alarms has not taken appropriate action to curb such conduct by its sales representatives and managers.  Some of the worst actors, like Gary Hand, continue to be employed by LA Alarms despite numerous reports of deceptive conduct by those salespeople.  LA Alarms does not terminate or appropriately discipline such sales representatives because they bring substantial revenue streams to LA Alarms.

Instead, LA Alarms engages in window dressing: providing half-hearted discouragement of such practices at the initial onboarding of new salespeople and promulgating empty-shell written policies purportedly prohibiting the practices.  In reality, LA Alarms' management condones and even teaches such deceptive sales tactics.  The individuals knowledgeable of how to successfully pull off deceptive sales practices are promoted in the sales force and then teach such tactics to new recruits as they are brought in each year. The cycle repeats in contagious fashion.

### LA ALARMS' BREACHES TO THE DEALER AGREEMENT

71.     In addition to its severe and pervasive deceptive conduct, LA Alarms also expressly breached, and continues to breach, provisions of the Dealer Agreement regarding non-disparagement, trademarks, and confidentiality.

72.     In regards to non-disparagement, LA Alarms agreed to the following provision:

> 27.   **Covenant of Non-Disparagement.**  Seller and Owners expressly acknowledge, agree, and covenants that it/he/she shall not make any statements, comments, or communications that are disparaging, derogatory or detrimental to the good name or business reputation of Buyer or any of its shareholders, directors, officers, or employees.  Where applicable, this non-disparagement covenant applies to any public or private statements, comments, or communications in any form, whether oral, written, or electronic. Seller also hereby acknowledges and agrees that it is the intent of the Parties that the covenant provided by this Section 28 shall indefinitely survive any termination of this Agreement.

*See* Ex. 1 at Section 27.

73.     This provision survives the termination of this Agreement.

74.     LA Alarms has breached this provision numerous times with its deceptive conduct by telling Alert 360's customers, *inter alia*, (1) that Alert 360 has gone out of business; (2) that Alert 360 is in bankruptcy; (3) that LA Alarms is the manufacturer of Alert 360's equipment; (4) that Alert 360 changed its named to LA Alarms; (5) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (6) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

75.     In regards to trademarks, LA Alarms agreed to the following provision:

31.     Services and Trademarks.

Seller and each Owner acknowledge and agree that the names Central Security Group, Inc., Central Security Group—Nationwide, Inc., Securenet Alarm Systems, Inc., Alert 360, Alert 360 by Central Security Group and Guardian Security Systems, Inc., derivatives thereof and any service marks, trademarks, trade names and logos used by Buyer (individually a "Mark" and collectively the "Marks") for the marketing, promotion and sale of its security service shall remain the exclusive property of Buyer and that Seller and Owners have not and shall not acquire any proprietary rights therein. Seller and Owners acknowledge the great value of goodwill associated with Buyer's Marks and the public renown and recognition of the same and that the Marks have a distinctiveness and secondary meaning that is firmly associated in the minds of the trade and general public with Buyer and that any additional goodwill symbolized by the Marks which may be created through the use of the Marks by Seller or Owners shall inure to the sole benefit of Buyer. Seller and Owners shall not use any of the Marks in any way, except as permitted by Buyer, whether during the term or following termination of this agreement.

*See* Ex. 1 at Section 31.

76.     This provision survives the termination of this Agreement.

77.     LA Alarms has breached this provision numerous times with its deceptive affiliation misrepresentations by telling Alert 360's customers, *inter alia*, (1) that LA Alarms is the manufacturer of Alert 360's equipment; (2) that Alert 360 changed its named to LA Alarms; (3) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (4) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

78.     In regards to confidentiality, LA Alarms agreed to the following provision:

32.    Confidentiality.

> The Parties agree that no party shall disclose any material terms of this Agreement (including all schedules and exhibits) for any purpose without the prior written consent of the other parties, unless such disclosure is required by law, court order, rule or regulation or is being made to any investor or lender (including their respective counsel and advisors) or Buyer or Seller in which case, prior to such disclosure, such investor or lender shall agree to abide by the provisions of this Section 32. Seller and Owners agree to maintain as secret and confidential all "Confidential Information," as defined herein and agree not to use, disclose, transfer, sell or disclose such information to any successors or third parties,

except as authorized in advance and in writing by Buyer. Seller shall also use its best efforts to restrict its agents and employees from having access to or using any Confidential Information. The term "Confidential Information" means any trade secrets, proprietary or other information relating to the Alarm Accounts, including, without limitation: Subscriber lists; Installation Agreements; Monitoring Agreements, Video Agreements; and lists, notes or compilations which contain the names, addresses, telephone numbers or any contract information for or relating to the Subscribers. Information relating to a particular Alarm or Video Account shall remain Confidential Information for a period of ten (10) years from the Closing Date of such Alarm or Video Account.

*See* Ex. 1 at Section 32.

79.    The provision applies until at least 2028, ten years from the execution of this Dealer Agreement.

80.    LA Alarms has breached this provision numerous times with its deceptive conduct by using confidential customer information it gleaned while operating as an authorized dealer of Alert 360 to target Alert 360 customers with deceptive practices.

81.    The Dealer Agreement allows Alert 360 to collect its attorneys' fees incurred in enforcing the Dealer Agreement against LA Alarms, to wit:

22.12.    Attorney's Fees and Cost.

> In the event any action is instituted by a party hereto regarding the construction of any term or to recover damages resulting from the breach of any term of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable fees, costs and expenses from the non-prevailing party.

*See* Ex. 1 at Exhibit H, Section 22.12.

## COUNT I - UNFAIR COMPETITION IN VIOLATION
## OF THE LANHAM ACT, 15 U.S.C. § 1125(a)
## (ALL DEFENDANTS)

82.     Alert 360 incorporates paragraphs 1 through 81 as if set forth fully herein.

83.     Alert 360 Opco, Inc. owns the Alert 360 Trademarks and is injured by any effort of Defendants to confuse Alert 360's customers as to the affiliations of Defendants and their representatives with Alert 360.

84.     Defendants use false representations of affiliation with Alert 360 to confuse Alert 360's customers as to Defendants' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to the customers' homes.

85.     In fact, Defendants and their representatives do not represent Alert 360, nor is LA Alarms affiliated in any manner with Alert 360.

86.     Defendants make these false representations to Alert 360's customers with the intent of deceiving Alert 360's customers as to a relationship or affiliation with Alert 360 that does not exist, and that has never existed.

87.     These false and misleading statements are likely to confuse consumers regarding LA Alarms' apparent (but false) affiliation with Alert 360 in the initial stages of a sale.

88.     Some Alert 360 customers, initially confused at their doorsteps, eventually realize by the end of the sale that Defendants represent LA Alarms, not Alert 360.  But many do not, and remain confused at the point of sale and sign contracts with LA Alarms in the mistaken belief that they are dealing with Alert 360 or one of its affiliates.  Even when the customer is initially confused but later comes to understand the sales representative is not affiliated with Alert 360, Alert 360 is still damaged by Defendants freeriding on Alert 360's name and brand recognition.

89.     Alert 360 has been and will continue to be damaged as a result of Defendants' false representations by the confusion of the market for Alert 360's goods and services, by the disruption of Alert 360's relationships with its customers, by the diversion of Alert 360's customers to Defendants, by Alert 360's lost royalties, by Alert 360's loss of control of the use of its brand in the market, by the reallocation of employees, money and resources combatting Defendants' deceptive conduct, and by damage to Alert 360's goodwill and reputation as a reliable provider of security systems.

90.     Alert 360 is entitled to an award of compensatory damages, as well as Defendants' profits, Alert 360's attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a).  The court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate Alert 360 fully for its losses.

91.     WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Defendants and award the following relief:

a)      Compensatory damages, in an amount to be established at trial;

b)      An accounting of Defendants' profits resulting from its deceptive practices, and payment of such profits to Alert 360;

c)      Attorney's fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a);

d)      Pre- and post-judgment interest; and

e)      Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT II – COMMON LAW TRADEMARK INFRINGEMENT
### (ALL DEFENDANTS)

92.      Alert 360 incorporates paragraphs 1 through 91 as if set forth fully herein.

93.     Alert 360 Opco, Inc. owns the Alert 360 Trademarks and is injured by any effort of Defendants to confuse Alert 360's customers as to the affiliations of LA Alarms' sales representatives with Alert 360.

94.     Defendants and their representatives use false representations of affiliation with Alert 360 to confuse Alert 360's customers as to the representatives' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

95.     At the time of the deceptive sales practices at issue herein, Defendants and their representatives did not represent Alert 360, nor was LA Alarms affiliated in any manner with Alert 360.

96.     Defendants and their representatives make these false representations to Alert 360's customers with the intent of deceiving Alert 360's customers as to a relationship or affiliation with Alert 360 that does not exist, and that has never existed.

97.     These false and misleading statements are likely to confuse consumers regarding LA Alarms' apparent (but false) affiliation with Alert 360 in the initial stages of a sale.

98.     Alert 360 customers have been and continue to be actually confused regarding LA Alarms' affiliation with Alert 360.

99.     Alert 360 has been and will continue to be damaged as a result of Defendants' false representations by the confusion of the market for Alert 360's goods and services, by the disruption of Alert 360's relationships with its customers, by the diversion of Alert 360's customers to LA Alarms, by Alert 360's lost royalties, by Alert 360's loss of control of the use of its brand in the market, by the reallocation of employees, money, and resources combatting Defendants' deceptive conduct, and by damage to Alert 360's goodwill and reputation as a reliable provider of security systems.

100.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a)      Compensatory damages, in an amount to be established at trial;

b)      Punitive damages in a sum sufficient to deter Defendants from engaging in further deceptive sales practices;

c)      Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

d)      Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT III – COMMON LAW UNFAIR COMPETITION
### (ALL DEFENDANTS)

101.    Alert 360 incorporates Paragraphs 1 through 100, as if set forth fully here.

102.    Alert 360 and LA Alarms compete for a common pool of customers.  Alert 360 and LA Alarms market alarm services to the same target market of residential customers.

103.    Defendants' use of false sales pitches have confused and continue to confuse Alert 360 customers as to LA Alarms' affiliation.

104.    Defendants' use of false sales pitches that confuse customers as to LA Alarms' affiliation, and as to the source of their services, has caused Alert 360 customers to cancel their Alert 360 alarm services under false pretenses, therefore causing damage to Alert 360.

105.    Defendants and their representatives' false sales pitches at customer doorsteps are knowing, willful, and in reckless disregard for the rights of others.  Accordingly, the Court should award punitive damages in an amount sufficient to deter Defendants from continuing to engage in unfair competition in the market for electronic security services through their sales representatives.

106.     WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a)      Compensatory damages, in an amount to be established at trial;

b)      Punitive damages in a sum sufficient to deter Defendants from engaging in further deceptive sales practices;

c)      Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

107.     Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT IV – VIOLATION OF THE OKLAHOMA DECEPTIVE TRADE PRACTICES ACT, 78 OKLA. STAT. § 54(A)
### (ALL DEFENDANTS)

108.     Alert 360 incorporates Paragraphs 1 through 107, as if set forth fully here.

109.     Alert 360 and Defendants compete for a common pool of customers.  Alert 360 and Defendants market alarm services to the same target market of residential customers.

110.     Defendants' use of false and deceptive sales pitches have confused and continue to confuse Alert 360 customers as to LA Alarms' affiliation.

111.     Defendants' use of false and deceptive sales pitches that confuse customers as to Defendants' affiliation, and as to the source of their services, has caused Alert 360 customers to cancel their Alert 360 alarm services under false pretenses, therefore causing damage to Alert 360. Alert 360 is entitled to recover damages under 78 Okla. Stat. § 54(A).

112.     Defendants and their representatives' false sales pitches at customer doorsteps are knowing, willful, and in reckless disregard for the rights of others.  Accordingly, the Court should

award punitive damages in an amount sufficient to deter Defendants from continuing to engage in unfair competition in the market for electronic security services through their sales representatives.

113.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief pursuant to 78 Okla. Stat. § 54(A):

a)    Compensatory damages, in an amount to be established at trial;

b)    Punitive damages in a sum sufficient to deter Defendants from engaging in further deceptive sales practices;

c)    Attorneys' fees, costs, pre-judgment interest, and post judgment interest incurred in the prosecution of this action; and

114.    Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT V –COMMON LAW MALICIOUS/TORTIOUS INTERFERENCE WITH A CONTRACT
## (ALL DEFENDANTS)

115.    Alert 360 incorporates Paragraphs 1 through 114 as if set forth fully herein.

116.    Alert 360 maintains valid and enforceable contracts and business relationships with its customers.

117.    Typically, Alert 360 customers display an Alert 360 sign or window sticker outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by an Alert 360 alarm system.

118.    Defendants are aware of the contractual and business relationship between Alert 360 and its customers.  When Defendants and their representatives visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing

the Alert 360 equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

119.    Despite knowledge of the customer's contractual and business relationship with Alert 360, Defendants and their representatives intentionally; maliciously; and without valid justification, excuse, or privilege interfere with such relationship using improper means, to wit, misleading Alert 360's customers into believing that Defendants represents Alert 360, that Defendants are affiliated with Alert 360, that they are visiting at Alert 360's direction, that they work for the companies that made the Alert 360 alarm equipment installed in the customers' homes, or that Alert 360 has otherwise blessed Defendants to work on Alert 360's behalf.  Once Defendants and their representatives induce Alert 360 customers to believe that they have an existing business relationship with Alert 360, Defendants and their representatives lead customers to sign LA Alarms contracts and install LA Alarms alarm systems, misleading Alert 360 customers to believe that they are receiving new Alert 360 equipment from Alert 360, an Alert 360 affiliate, or an Alert 360 successor, that LA Alarms is assuming the Alert 360 account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.  Further, upon information and belief, Defendants and their representatives procure the breach of the Alert 360 contract upon the promise that LA Alarms will "buy out" the remaining term by paying to the customer an amount equal to the remaining obligation on their Alert 360 contract.

120.    Upon information and belief, Defendants also offer buyouts to "save" sales procured through deceptive sales conduct in an attempt to pacify the customer.

121.    The customer does not always remit such payment to Alert 360.  Even when the customer does, Alert 360 is damaged because the value of the customer's future account revenue

often exceeds the contractual value of the remaining contractual term.  For example, absent Defendants' improper interference, it is not uncommon for a customer with two years left on his or her Alert 360 contract to remain a loyal and paying customer to Alert 360 for many years beyond the remaining two-year term.  This is also why Defendants wrongfully engages in such buyout practices: Defendants know the value of an alarm account often exceeds the immediate value under the contract.

122.    Defendants' intentional, malicious, and unjustifiable interferences with Alert 360's business relationships have caused Alert 360 to suffer irreparable harm and damages in the form of lost goodwill and lost profits.  Alert 360 is also damaged by Defendants' unlawful conduct by losing revenue streams that otherwise would remain with Alert 360 absent Defendants' "buy out" offer, and because the customer does not always remit any remaining amounts due and owing to Alert 360.

WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a)      Compensatory damages, in an amount to be established at trial;

b)      Punitive damages in a sum sufficient to deter Defendants from engaging in further deceptive sales practices;

c)      Attorneys' fees and costs;

d)      Pre-judgment interest and post judgment interest incurred in the prosecution of this action; and

e)      Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT VI – NEGLIGENT SUPERVISION AND TRAINING
### (DEFENDANT LA ALARMS)

123.     Alert 360 incorporates Paragraphs 1 through 122 as if set forth fully herein.

124.     Some or all of LA Alarms' sales representatives and sales managers, including but not limited to Gary Hand, are employees of LA Alarms.

125.     Within the course and scope of their employment, LA Alarms' sales representatives and sales managers are directed by LA Alarms to engage in door to door sales of alarm monitoring services.

126.     LA Alarms' sales representatives and sales managers, including Gary Hand, approach Alert 360 customers and tell them, *inter alia*, that Alert 360 has gone out of business; that Alert 360 is in bankruptcy; that LA Alarms is the manufacturer of Alert 360's equipment; that Alert 360 changed its named to LA Alarms; that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

127.     LA Alarms has a duty to supervise and train its sales representatives and sales managers, including Gary Hand, and to take reasonable care to prevent them from engaging in deceptive sales practices.

128.     LA Alarms has breached that duty by failing to supervise and train its sales representatives and sales managers, including Gary Hand, on honest, appropriate sales practices that do not misrepresent LA Alarms' relationship with Alert 360.

129.     As a direct and proximate result of LA Alarms' failure to supervise and train its sales representatives and sales managers, Alert 360 has suffered irreparable harm and damages in the form of lost goodwill and lost profits.

130.    WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against LA Alarms, and award the following relief:

a)  Compensatory damages, in an amount to be established at trial, including damages caused to Alert360's property in ripping out and discarding active alarm systems;

b)  Punitive damages in a sum sufficient to deter further negligent supervision and training;

c)  Attorneys' fees and costs;

d)  Pre-judgment interest and post judgment interest incurred in the prosecution of this action; and

e)  Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT VII – BREACH OF CONTRACT
### (DEFENDANT LA ALARMS)

131.    Alert 360 incorporates Paragraphs 1 through 130 as if set forth fully herein.

132.    LA Alarms entered into a Dealer Agreement with Alert 360.  *See* Ex. 1.

133.    The Dealer Agreement is a binding contract.

134.    LA Alarms breached, and continues to breach, provisions of the Dealer Agreement regarding non-disparagement, trademarks, and confidentiality.

135.    In regards to non-disparagement, LA Alarms agreed to the following provision:

27.    Covenant of Non-Disparagement.  Seller and Owners expressly acknowledge, agree, and covenants that it/he/she shall not make any statements, comments, or communications that are disparaging, derogatory or detrimental to the good name or business reputation of Buyer or any of its shareholders, directors, officers, or employees.  Where applicable, this non-disparagement covenant applies to any public or private statements, comments, or communications in any form, whether oral, written, or electronic. Seller also hereby acknowledges and agrees that it is the intent of the Parties that the covenant provided by this Section 28 shall indefinitely survive any termination of this Agreement.

*See* Ex. 1 at Section 27.

136.   LA Alarms has breached this provision numerous times with its deceptive conduct by telling Alert 360's customers, *inter alia*, (1) that Alert 360 has gone out of business; (2) that Alert 360 is in bankruptcy; (3) that LA Alarms is the manufacturer of Alert 360's equipment; (4) that Alert 360 changed its named to LA Alarms; (5) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (6) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

137.   In regards to trademarks, LA Alarms agreed to the following provision:

31.   Services and Trademarks.

Seller and each Owner acknowledge and agree that the names Central Security Group, Inc., Central Security Group—Nationwide, Inc., Securenet Alarm Systems, Inc., Alert 360, Alert 360 by Central Security Group and Guardian Security Systems, Inc., derivatives thereof and any service marks, trademarks, trade names and logos used by Buyer (individually a "Mark" and collectively the "Marks") for the marketing, promotion and sale of its security service shall remain the exclusive property of Buyer and that Seller and Owners have not and shall not acquire any proprietary rights therein. Seller and Owners acknowledge the great value of goodwill associated with Buyer's Marks and the public renown and recognition of the same and that the Marks have a distinctiveness and secondary meaning that is firmly associated in the minds of the trade and general public with Buyer and that any additional goodwill symbolized by the Marks which may be created through the use of the Marks by Seller or Owners shall inure to the sole benefit of Buyer. Seller and Owners shall not use any of the Marks in any way, except as permitted by Buyer, whether during the term or following termination of this agreement.

*See* Ex. 1 at Section 31.

138.   LA Alarms has breached this provision numerous times with its deceptive affiliation misrepresentations by telling Alert 360's customers, *inter alia*, (1) that LA Alarms is the manufacturer of Alert 360's equipment; (2) that Alert 360 changed its named to LA Alarms; (3) that LA Alarms has come to upgrade Alert 360 customers' alarm keypads; and (4) that LA Alarms purchased Alert 360, so the alarm signals will no longer go to the police if the customer does not replace the equipment.

139.   In regards to confidentiality, LA Alarms agreed to the following provision:

32.    Confidentiality.

The Parties agree that no party shall disclose any material terms of this Agreement (including all schedules and exhibits) for any purpose without the prior written consent of the other parties, unless such disclosure is required by law, court order, rule or regulation or is being made to any investor or lender (including their respective counsel and advisors) or Buyer or Seller in which case, prior to such disclosure, such investor or lender shall agree to abide by the provisions of this Section 32. Seller and Owners agree to maintain as secret and confidential all "Confidential Information," as defined herein and agree not to use, disclose, transfer, sell or disclose such information to any successors or third parties,

except as authorized in advance and in writing by Buyer. Seller shall also use its best efforts to restrict its agents and employees from having access to or using any Confidential Information. The term "Confidential Information" means any trade secrets, proprietary or other information relating to the Alarm Accounts, including, without limitation: Subscriber lists; Installation Agreements; Monitoring Agreements, Video Agreements; and lists, notes or compilations which contain the names, addresses, telephone numbers or any contract information for or relating to the Subscribers. Information relating to a particular Alarm or Video Account shall remain Confidential Information for a period of ten (10) years from the Closing Date of such Alarm or Video Account.

*See* Ex. 1 at Section 32.

140.    LA Alarms has breached this provision numerous times with its deceptive conduct by using confidential customer information it gleaned while operating as an authorized dealer of Alert 360 to target Alert 360 customers with deceptive practices.

141.    As a direct and proximate result of LA Alarms' numerous breaches of the Dealer Agreement, Alert 360 has suffered direct and consequential damages.

142.    Alert 360 has suffered irreparable harm and damages in the form of lost goodwill and lost profits.  Alert 360 has also been damaged by LA Alarms' unlawful conduct by losing revenue streams that otherwise would remain with Alert 360 absent LA Alarms' "buy out" offer, and because the customer does not always remit any remaining amounts due and owing to Alert 360.

WHEREFORE, Alert 360 respectfully requests that the Court enter judgment in its favor and against LA Alarms, and award the following relief:

a.   Compensatory damages, in an amount to be established at trial;

b.   Consequential damages, in an amount to be established at trial;

c.   Attorneys' fees and costs, which are expressly recoverable under the Dealer Agreement;

d.   Pre-judgment interest and post judgment interest incurred in the prosecution of this action; and

e.   Such other and further relief as the Court may deem appropriate in the circumstances.

## JURY DEMAND

Alert 360 demands a trial by jury on all issues so triable.

Dated:  July 9, 2024.    Respectfully submitted,

**CHRISTENSEN LAW GROUP, P.L.L.C.**

By: /s/ J. Clay Christensen
J. Clay Christensen (OBA #11789)
Jonathan M. Miles (OBA #31152)
Brock Z. Pittman (OBA #32853)
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Tel: (405) 232-2020
Fax: (405) 228-1113
Clay@christensenlawgroup.com
Jon@christensenlawgroup.com
Brock@christensenlawgroup.com

**SHOOK, HARDY & BACON L.L.P.**

By: /s/ Charles C. Eblen
Charles C. Eblen (*pro hac vice forthcoming*)
Jason Scott
2555 Grand Blvd.
Kansas City, Missouri 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
ceblen@shb.com
jscott@shb.com

-and-

Caroline M. Gieser
1230 Peachtree Street
Suite 1200
Atlanta, Georgia 30317
Tel: (470) 867-6013
Fax: (470) 867-6001
cgieser@shb.com

*Counsel for Plaintiffs, Alert 360 Opco, Inc.,*
*d/b/a Alert 360*

33

## **<u>CERTIFICATE OF SERVICE</u>**

I, <u>J. Clay Christensen</u>, an attorney, hereby certify that on **July 9, 2024** , I caused a true and complete copy of the foregoing **Complaint** to be electronically filed with the Clerk via the Pacer e-filing system.

<u>*/s/ J. Clay Christensen*</u>
*Counsel for Plaintiffs, Alert 360 Opco, Inc.,*
*d/b/a Alert 360*